UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| ZAKIYYAH SABREE, administratrix of the Estate of NAILAH WILLIAMS-SABREE, | : | Hon. Joseph H. Rodriguez |
| | : | |
| Plaintiff, | | Civil Action No. 06-2164 (consolidated with 07-2936) |
| | : | |
| v. | : | |
| | | |
| DONNYELL WILLIAMS, et al. | : | |
| | | OPINION |
| Defendants. | : | |

These matters have come before the Court on motion of Defendant Donnyell Williams, for summary judgment pursuant to Fed. R. Civ. P. 56 [filed under civil action number 06-2164 as Document 35] and on motion of Defendants United States of America, the United States Air Force, and Michael W. Wynne, Secretary of the United States Air Force, to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and Fed. R. Civ. P. 12(b)(6) [filed under civil action number 07-2936 as Document 8]. The Court has considered the submissions of the Defendants, and Plaintiff's opposition to both motions, and heard oral argument on Defendants' motion to dismiss on the record on June 23, 2008. For the reasons set forth here, and on the record during oral argument, the motion for summary judgment is DENIED and the motion to dismiss is GRANTED.

**FACTUAL BACKGROUND**

Four year old Nailah Williams-Sabree was beaten and tortured to death by her step-mother, April Williams, at their home on the Maguire Air Force Base in Burlington County New Jersey on May 15, 2004. Nailah's biological mother, Plaintiff Zakiyyah Sabree, filed two Complaints in this Court as the Administratrix of her daughter's estate. The first Complaint (the "Williams Complaint") asserts a claim under New Jersey's Wrongful Death statute, N.J.S.A. 2A:31-1, et seq. (Count I) and a claim under New

Jersey's Survival Action, N.J.S.A. 2A:15-1 et seq. (Count II) against Nailah's biological father, Defendant Donnyell Williams.  The second Complaint (the "government Complaint"), filed pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671, et seq., alleges the same counts, contending that the Defendants United States of America, the United States Air Force, and Michael W. Wynne, Secretary of the United States Air Force (collectively the "government"), acting through various agencies within the Air Force, proximately caused injuries to and the death of Nailah by failing to follow their own mandatory procedures in the investigation of an earlier instance of abuse involving April Williams and Nailah.  The two cases were consolidated on December 10, 2007 under civil action number 06-2164.[1]

For the past ten years, Donnyell Williams has been a member of the United States Air Force.  (Cert. of Donnyell Williams, ¶ 1).  During 1999, he met Zakiyyah Sabree, who at the time was also a member of the military; both were stationed in Illinois.  (Id. at ¶ 3).  Zakiyyah Sabree became pregnant after a tryst and on February 3, 2000 their daughter, Nailah Williams-Sabree, was born.  (Id.)  Zakiyyah gave birth in Georgia; Donnyell remained in Illinois, as the two never married.  (Id. at ¶¶ 3-4, 5).  Shortly thereafter, Donnyell petitioned the St. Claire County Court in Illinois seeking a determination of parenthood and for primary custody of Nailah.  (Id.)  Although the court fashioned a custody arrangement, neither parent provided the other parent with financial support. (Id. at ¶6; Dep. of Donnyell Williams, Plaintiff's Ex. E., p. 46.)

The Joint Parenting Agreement and Order of Parentage and Custody governing

---

[1] At times, the Opinion will refer to the parties and their family members by their first names, so as to avoid confusion.

the relationship of Nailah's parents was entered into effect on October 23, 2003. (Plaintiff's Exs. C. & D.). Shortly thereafter began the string of unfortunate events that led to the tragic death of Nailah.[2]  On November 5, 2003, after 10 p.m., Donnyell and April Williams told Nailah to stand outside, apparently to issue a "time-out" form of discipline to the child, who was having a tantrum.  (Family Advocacy Record, Plaintiff's Ex. G).  The temperature was below forty (40) degrees and it was raining; the child did not have a coat on.  (Id.)  A neighbor approached Nailah and was informed by the child that she was to stand outside until she stopped crying.  (Id.)  As the neighbor was getting a blanket out of her car for the three year old, April Williams came to the door and brought Nailah back inside.  (Id.)

The Family Advocacy Program at Maguire Air Force Base ("FAP") was notified of the incident and conducted an investigation.  At the conclusion of the investigation, which found no incidents of physical abuse or other cause for concern[3], the investigator went over proper "time-out" techniques with the Williamses and agreed (but not required) that the child should live with Zakiyyah.  (Id.)  The case was referred to the New Jersey Division of Youth and Family Services but no action was taken by that

---

[2]The record in this case demonstrates a sad history of a child being shuffled between her parents. It is not necessary to recount the reasons behind the custody shifts at this point, as those occurrences have no bearing on the motion for summary judgment.  The Court takes no position in this case as to who was the "better" parent to Nailah.  Donnyell Williams, through his deposition and certification paints a picture of a responsible parent.  The facts that are put forth in this Opinion to counter that assertion are not meant in any way to express the Court's opinion of poor parenting on the part of Donnyell Williams or Zakiyyah Sabree.  Instead, the facts are meant to highlight the presence of genuine issues for the jury.

[3]  The report states that there were no reports of physical, sexual or emotional abuse.  (Family Advocacy Record, November 5, 2003, Plaintiff's Ex. G.)

agency.  (Id. December 11, 2003 report ("DYFS related they are not opening a case."))

In December 2003, Donnyell sent Nailah to live with Zakiyyah after the FAP

investigation of abuse or neglect (the parties style it differently).  (Id.)  However, in April

2004, Zakiyyah called Donnyell to come and pick up the child.  (Cert. of Donnyell

Williams, ¶16).  The reasons behind the custody shift are disputed and Nailah came back

to Maguire Air Force Base to live with her father and step-mother, April Williams.  No

one notified FAP that the child was back on base, as had been requested by the FAP

investigators.  (See January 7, 2004 Family Advocacy Record, Plaintiff's Ex. G.).

On May 8, 2004 Donnyell was dispatched to the Shephard Air Force Base in

Houston, Texas and left Nailah in April's care during his two week assignment.  (Cert. of

Donnyell Williams, ¶17).  On May 15, 2004 Nailah was murdered by her step-mother.

The details of her death are terrible, as the child was tortured and strangled.  On that

day, April and Donnyell spoke on the phone at least two[4] times, as April relayed her

frustrations with Nailah's behavior and screaming. (Dep. of Donnyell Williams,

Plaintiff's Ex. E., p. 57).  Donnyell stated that April was "distressed" and that "she did

not know what to do."  (Id.).  Donnyell suggested that April watch a movie, call a

girlfriend, and that she pre-emptively contact his First Sergeant to explain Nailah's

screams.  (Id. at 55-56).  When asked why he suggested the pre-emptive call, Donnyell

explained that his neighbors had called one night when his dog was barking; so he

---

[4]The deposition transcript provided by Plaintiff shows that Donnyell Williams
stated that he spoke to April Williams on the day of the murder at least two (2) times.
(Dep. of Donnyell Williams, Plaintiff's Ex. E., p. 55) The transcript of the May 17, 2004
interview notes that Donnyell Williams recalled speaking to April Williams
approximately four (4) times.  (Plaintiff's Ex. F.).

suggested the call to let the First Sergeant "know what is going on before everybody is looking at it the wrong way." (Id. at 56). Donnyell never suggested that April call Family Advocacy. (Id.)

Following Nailah's death, Donnyell was investigated by the Air Force Office of Special Investigations and was exonerated of any wrong doing. (Defendant's Ex. I.). April Williams was charged with manslaughter and plead guilty on July 25, 2005. Interestingly, April Williams is not being sued by Zakiyyah Sabree. Instead, Donnyell Williams, the United States of America, the United States Air Force, and Michael W. Wynne, Secretary of the United States Air Force are the defendants in this case.

## A. Motion of Donnyell Williams for Summary Judgment

Donnyell Williams seeks summary judgment on Plaintiff's wrongful death and survival actions based upon a claim of negligent entrustment on two grounds. First, Williams asserts that the claim is barred by the New Jersey Doctrine of Parental Immunity, reaffirmed in Foldi v. Jeffries, 93 N.J. 533 (1983). The Doctrine of Parental Immunity does not immunize willful or wanton conduct. Id. at 549. Thus, in the alternative, Williams asserts that April Williams's conduct was a superceding cause of the death of his daughter and seeks a grant of summary judgment on that ground. These arguments will be addressed in turn.

## Summary Judgment Standard

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986));

accord Fed. R. Civ. P. 56 (c).  Thus, this Court will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56 ©).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994).  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Andersen, 477 U.S. at 256-57.  "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992) (quoting Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991)).  Indeed,

the plain language of Rule 56(c) mandates the entry of summary

judgment, after adequate time for discovery and upon motion, against a
party who fails to make a showing sufficient to establish the existence of an
element essential to that party's case, and on which that party will bear the
burden of proof at trial.

Celotex, 477 U.S. at 322.

In deciding the merits of a party's motion for summary judgment, the court's role

is not to evaluate the evidence and decide the truth of the matter, but to determine

whether there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

249 (1986).  Credibility determinations are the province of the fact finder.  Big Apple

BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

**The  New Jersey Parental Immunity Doctrine**

The underlying purpose of the New Jersey Parental Immunity Doctrine is to

preserve the sanctity of the family by preventing judicial intrusion into certain decisions

that parents make regarding the care and welfare of their children.  "There are certain

areas of activities within the family sphere involving parental discipline, care, and

control that should and must remain free from judicial intrusion." Foldi, 93 N.J. at 545.

These decisions include philosophical considerations, determinations of physical, moral,

and intellectual growth, the exercise of parental authority, and, most applicable here, the

provision of customary child care.  Id. at 546.  However, some courts have recognized

that there are times when judicial intrusion is both warranted and necessary, which has

lead to confusion over when the doctrine should apply.

Historically, courts in New Jersey struggled to balance the growing trend toward

abrogation of the doctrine with the notion that immunity is necessary in certain

circumstances.  The New Jersey Supreme Court in Foldi carefully set out the historical

7

lineage, noting the disparate application of the doctrine, and put an end to the confusion when, in very clear terms, it announced that the parental immunity doctrine protects *all claims of negligent supervision but does not protect willful or wanton behavior.*  93 N.J. at 545 (emphasis added).  "Thus, we hold that while the doctrine of parental immunity is a bar to a suit alleging negligent supervision, it does not protect a parent who has willfully or wantonly failed to watch over his or her child.  We think that this holding represents a reasonable compromise between two legitimate aims-a parent's right to raise, free of judicial interference, his or her child as he or she deems best, and a child's right to receive redress for wrongs done to him or her."  Id. at 547.

Although Foldi reestablished the doctrine's continued vitality, it did not provide guidance on which factors were germane to the doctrine's applicability.  The New Jersey Appellate Division clarified the analysis, identifying the following as relevant: 1) whether a fact finder could conclude what acts or omissions by the parents were the proximate cause of the child's injury, 2) whether the conduct involves the exercise of parental authority IF YES, THEN, 3) whether the conduct constitutes a lack of parental supervision IF YES, THEN 4) whether that conduct was willful and wanton.  Marcinelli v. Crosby 247 N.J.Super. 456, 460 (App. Div. 1991)(citing Murray by Olsen v. Shimalla, 231 N.J.Super. 103, 106 (App. Div. 1989)).  These considerations will be addressed in turn.

**1. Proximate Cause**

_____A fact finder could conclude that Donnyell Williams was the proximate cause of his daughter's death because he chose to leave his daughter in the care of his wife despite knowing that April had previously gone "too far" in her discipline attempts

and/or because he failed to act on his concern that April would go too far in disciplining Nailah on the day of her eventual death. (See Interview of S.SGT. Donnyell Williams, May 14, 2004, Plaintiff's Ex. F.). Generally, issues of proximate cause are for the jury. Garrison v. Twp. of Middletown, 154 N.J. 282, 308 (1998) (Stein, J., concurring). However, on a motion for summary judgment, a plaintiff must identify some evidence that demonstrates the likelihood that the conduct of the defendant was a cause in fact of the plaintiff's injury. Davidson v. Slater, 189 N.J. 166, 185 (2007).

Here, April was the subject of the an investigation by the Family Advocacy authorities for the "time-out" incident described supra. [5] (Plaintiff's Exhibit G.). The record reflects that Donnyell was concerned about his wife's propensity to go too far with her discipline of his child. Specifically, Williams told Investigators (on May 17, 2004 following the death of Nailah) that:

> "[April Williams] scolded [Nailah's] tantrums more than was necessary because she had never been around children that throw temper tantrums and she did not know how to deal with it. When [April] overreacted or went too far on **scolding or spanking** [Nailah, Donnyell] told her to calm down and he would take care of the situation. When [Nailah] was bad, [April and Donnyell] would **scold her, strike her hand or buttocks, or strike her hand or buttocks with a belt.** [Donnyell] stated, in his opinion, [Nailah] and [April] had a hard time dealing with each other due to the fact that there was no transition period or adjustment time for the two to get used to each other."

(Interview of S.SGT. Donnyell Williams, May 14, 2004, Plaintiff's Ex. F.) (emphasis added).

---

[5]The investigation categorized the incident as a "mild" occurrence and found no evidence of physical or emotional abuse. In fact, the child reported no instances of "adverse discipline at home." (Family Advocacy Record, November 5, 2003, Defendant's Ex. E.). Also, April Williams had no criminal record and there is nothing in the record to suggest that she had any other documented instances of questionable behavior.

In addition, on the day the child was murdered, during one of the many conversations Donnyell had with April, he instructed her to call his First Sergeant to explain the noise coming from the house, so as to pre-empt any suspicion of wrongdoing in case a neighbor filed a complaint. (Plaintiff's Exhibit F).  While this fact may be a plausible response to noise-sensitive community, it could also be reasonably construed less favorably, as an attempt to prevent the "intrusion" of the Family Advocacy investigators.  Standing alone, these individual actions of the Defendant may not be enough to withstand summary judgment.  But, viewing the evidence in a light most favorable to the Plaintiff, the totality of these actions raises genuine issues of material fact for the jury to evaluate.

The most compelling reason for denying summary judgment comes from the Defendant's failure to act.  During one of his conversations with April on the day of the murder, Donnyell stated that "he was concerned that [April] might go too far in punishing [Nailah]".  (Interview of S.SGT. Donnyell Williams, May 14, 2004, Plaintiff's Ex. F.).  Yet, he failed to notify anyone of his concerns.  He left Nailah in the care of a person who he knew had a tendency to go too far with disciplining the child and did nothing despite his concerns that April might "go too far in punishing [Nailah]." (Id.) Given all of these facts and viewing the evidence in a light most favorable to the Plaintiff, Donnyell Williams could be found to be the proximate cause of the murder of his daughter.

## 2. The Exercise of Parental Authority

Plaintiff contends that Williams violated this agreement by placing Nailah in April's care; he should have placed the child in the care of her mother as required by the

custody order.[6]  According to Donnyell Williams's deposition, he may not have informed Zakiyyah that he was being sent to Texas for two weeks and that April Williams was going to care for Nailah during that time period (Dep. Of Donnyell Williams, Plaintiff's Exhibit E., pp. 47-48).  For these reasons, Plaintiff states that this is a matter of public concern because it presents a different situation than those contemplated by the Parental Immunity Doctrine; the decision is not one of day care or camp with no previous knowledge of abuse or neglect by the facility, because the volatile behavior of April was known to Williams before he left Nailah in her care. [7]

Williams disagrees and notes that our military must make the best arrangements for their children under the circumstances, and April was a logical choice, especially considering the lack of family in the New Jersey area.  In his view, this is a classic example of the exercise of parental authority.

The distinction between common negligence and actions immunized by the Parental Immunity Doctrine is not always clear.  Two cases cited by the parties highlight the difficulty in making the distinction.  In Mancinelli, the New Jersey Appellate Division considered whether the actions of a mother constituted negligence or actions immune from suit under the New Jersey Parental Immunity Doctrine.  247 N.J.Super

---

[6]The Joint Parenting Agreement provides that "at all times when our child is under their physical care, each shall refrain from placing our child in an environment or exposing our child to activities that may endanger our child's physical, mental, emotional or moral well-being."  (Joint Parenting Agreement, Plaintiff's Ex. D, ¶10)

[7]In addition, no one ever informed Zakiyyah Sabree of the "time out" incident. (Dep. of Zakiyyah Sabree, Plaintiff's Ex. A., p. 83) During oral argument on the motion to dismiss, the government conceded that they never informed Ms. Sabree of their findings.

456.  In that case, a mother escorted her child into the street and they were struck by an oncoming car. Id. at 458.  Witnesses to the accident noted that the mother "darted" out into the street. Id.  The Appellate Division concluded that the mother's actions constituted negligence and that she was not immune from suit.  It reasoned that the act of physically escorting the child was an exercise of parental authority immune from suit, but that the mother's negligence in "darting out" into the street caused the child's injuries. Id. at 461. "This was simple, garden-variety negligence by the parent which exposed both the parent and the child to injury. Although [the mother] may have literally exercised parental authority in transporting her child across the street, this is not the sort of exercise of parental authority in child-rearing intended for protection by the parental immunity doctrine." Id.

Conversely, in Foldi the Supreme Court concluded that a mother's failure to supervise a two and a half year old who wandered into the neighbor's yard and was bit by the neighbor's dog was not actionable because the failure to supervise the child fell within the actions immunized by the Parental Immunity Doctrine.  93 N.J. 533. However, the court stated that negligent supervision that falls within the ambit of willful or wanton supervisory misconduct is not immunized.  Id.

Here, Donnyell Williams's decision to leave his daughter with his wife would ordinarily be considered an exercise of parental authority.  However, in light of Marcinelli, Donnyell's decision to leave Nailah with a person who he admitted at times had gone too far with her discipline and under circumstances that he acknowledged were stressful (little time for Nailah and April to have a transition period) complicates this case.  Because there are genuine issues of fact related to what Donnyell knew at the

12

time he left his daughter in the care of April Williams, it is not clear at this time whether the conduct constitutes the exercise of parental authority.

## 3. Whether Donnyell Williams's behavior constitutes a lack of parental supervision.

Both parties stipulate that Donnyell Williams's conduct constituted a lack of supervisory authority.

## 4. Whether the conduct was willful or wanton.

There are genuine issues of material fact related to the determination of whether Donnyell Williams's conduct constituted willful or wanton misconduct. The New Jersey Supreme Court expresses the concept of willful or wanton misconduct as follows:

> it must appear that the defendant with knowledge of existing conditions, and conscious from such knowledge that injury will likely or probably result from his conduct, and with reckless indifference to the consequences, consciously and intentionally does some wrongful act or omits to discharge some duty which produces the injurious result.
>
> * * *
>
> [W]illful [or] wanton misconduct signifies something less than an intention to hurt. To establish that condition it is not necessary that the defendant himself recognize his conduct as being extremely dangerous; it is enough that he know, or has reason to know, of circumstances which would bring home to the realization of the ordinary reasonable man the highly dangerous character of his conduct.

Foldi, 93 N.J. at 549 (quoting McLaughlin v. Rova Farms, Inc., 56 N.J. 288, 305-10 (1970)).

Unlike an intentional tort, "wanton or willful misconduct does not require the establishment of a positive intent to injure." Tabor v. O'Grady, 61 N.J.Super. 446, 451, 161 A.2d 267 (App.Div. 1960). Instead, a "parent must be conscious . . . that injury will likely or probably result from his conduct, and with reckless indifference to the

consequences, [the parent] consciously and intentionally **does some wrongful act or omits to discharge some duty which produces injurious result**." Buono v. Scalia, 179 N.J. 131, 138 (2004)(emphasis added).   An examination of the conduct should consider the "totality of the circumstances". Id.

Considering all of the circumstances surrounding this case in a light most favorable to Plaintiff, the fact that Donnyell Williams left his daughter in the care of April Williams and did nothing when his concerns that April would go too far in punishing Nailah materialized, places this case outside the "honest errors of judgment" exception contemplated by Buono.   Id. at 142.   In Buono, the New Jersey Supreme Court held that a child could not maintain a claim of negligent supervision against his father. The father permitted the child to ride his bike in a confined area causing injury to another child.   In reaffirming the vitality of Foldi, the Court stated that New Jersey is "not going to force parents to defend against their negligent but otherwise honest errors of judgment in those settings, [and] risk opening the flood gates of intrusive litigation in precisely the manner that Foldi sought to avoid."   Id. at 142.

Here, there is evidence in the record from which a jury could conclude that Donnyell Williams's conduct was "willful or wanton."   Donnyell Williams's deposition testimony and certification both aver that he did not have any concerns about leaving Nailah with April during his deployment to Texas.   (Dep. of Donnyell Williams, Plaintiff's Ex. E., p. 53; Cert. of Donnyell Williams, ¶ 18)   However, his statements to investigators following the death of his daughter highlight a credibility issue. Specifically, as discussed under the "Proximate Cause" section of this Opinion, Donnyell admitted that April had previously gone too far in her discipline; that during one of his

14

conversations with April on the day of the murder "he was concerned that [April] might go too far in punishing [Nailah]"; and that despite these concerns, he failed to act on his daughter's behalf. (Interview of S.SGT. Donnyell Williams, May 14, 2004, Plaintiff's Ex. F.; <u>see</u> <u>also</u>, pp. 8-10 , <u>supra</u>.)  Thus, there is evidence in the record from which a jury could conclude that Donnyell Williams had "knowledge of existing conditions" (April had harshly disciplined the child before using a belt and was investigated by the FAP for the "time-out incident") "and with reckless indifference to the consequences, [Donnyell Williams] consciously and intentionally [left Nailah in April's care and failed to notify anyone of his concern that April will go too far in disciplining the child]."  <u>Foldi</u>, 93 N.J. at 549 (quoting <u>McLaughlin</u>, 56 N.J. at 305-10).

In addition, given that there is conflicting evidence in the record with respect to the level of concern Mr. Williams had regarding April's use of discipline and that, ultimately, Mr. Williams's credibility is at the heart of these concerns, the "risk [of] opening the flood gates of intrusive litigation" is not substantial.  For all of these reasons, summary judgment is denied on this ground.

**April Williams as a Superceding Cause**

April Williams plead guilty to murdering Nailah and is currently serving her sentence.  In <u>Blount v. Klapproth</u>, 309 N.J. Super. 493 (App. Div. 1999), the New Jersey Appellate Division explained the effect of superceding or intervening criminal acts. "Under this rule, the actor must realize there is a likelihood that the failure to act would create an invitation or temptation which would be likely to lead to the commission of the crime, either because the invitation or temptation is such that a 'recognizable percentage of humanity is likely to yield' or is created at a place where 'persons of particularly

vicious type are likely to be' and likely to lead to the commission of fairly definite types of crime." Id. at 514 (App. Div. 1998)(citing Restatement (Second) of Torts ¶ 448 at cmts. b and c (1965)).

The Restatement (Second) of Torts Section 448  explains superceding or intervening cause as :

> The act of a third person in committing an intentional tort or crime is a superseding cause of harm to another resulting therefrom, although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime, **unless the actor at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created**, and that a third person might avail himself of the opportunity to commit such a tort or crime.

(emphasis added); see also United States ex rel. Schmidt v. Zimmer, Inc., 386 F.3d 235, 245, n.11 (3d Cir. 2004).

For all of the reasons discussed supra., in the Parental Immunity Section of this Opinion, there are genuine issues of material fact related to whether Donnyell Williams realized or should have realized that leaving Nailah with his wife presented a circumstance and/or an opportunity that was likely to cause April Williams to harshly discipline Nailah.  Again, credibility is at issue, and it appears that such a conclusion is not unreasonable given the evidence in the record that April Williams had previously harshly disciplined the child, including spanking with a belt, and that the child had frequent tantrums, creating a likelihood that April would have to discipline Nailah during Mr. Williams's absence.  Summary judgment is denied on this ground.

## B. Motion to Dismiss of the United States of America, et al.

On June 25, 2007, Plaintiff filed a complaint against the United States of America, the United States Air Force, and Michael W. Wynne, Secretary of the United States Air Force (collectively the "government") alleging two claims under the Federal Tort Claims Act.  The Complaint asserts that the Maguire Air Force Base's Family Advocacy Program ("FAP"), Family Advocacy Committee ("FAC"), the Family Advocacy Officer ("FAO"), and the Family Maltreatment Case Management Team ("FMCMT") proximately caused the injuries to and death of Nailah by failing to follow their own mandatory policies, procedures and regulations in the investigation, course of investigation, and closing of an earlier case involving April Williams's maltreatment or abuse of the child.  (See, generally, Government Complaint)

The government seeks to dismiss the complaint on three grounds: 1) that this Court lacks subject matter jurisdiction over all of the claims against defendants United States Air Force and Michael W. Wynne, Secretary of the Air Force; 2) that this Court lacks subject matter jurisdiction over all of Plaintiff's claims because they are not based upon the breach of an actionable duty under New Jersey law and;3) that the Complaint fails to state a claim upon which relief can be granted because the death of the child was not proximately caused by the government's alleged acts or omissions.

## Fed.R.Civ.P. 12(b)(1) and 12(b)(6) Standard

"It is a principle of first importance that federal courts are courts of limited jurisdiction."  13 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3522 (2d ed. 1984).  Accordingly, federal courts are duty-bound to ensure that they have jurisdiction over the matters before them.  As noted previously, the

17

instant motion was originally filed as one to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

A motion challenging a federal court's subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) differs from a challenge made pursuant to Fed. R. Civ. P. 12(b)(6) in that it does not afford a plaintiff the benefit of all of the same procedural safeguards. Robinson v. Dalton, 107 F.3d 1018, 1021 (3d Cir. 1997); Cohen v. Kurtzman, 45 F. Supp. 2d 423, 428 (D.N.J. 1999).  Instead, Fed. R. Civ. P. 12(b)(1) attacks the right of a plaintiff to even be heard in federal court.  Id.  As such, a court cannot dismiss a claim under 12(b)(6) without first assuming subject matter jurisdiction; thus, a claim can be dismissed for lack of subject matter jurisdiction or failure to state a claim, but not both. See Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991) (holding court must assume jurisdiction over a case before deciding legal issues on the merits); see also Spencer v. Casavilla, 903 F.2d 171, 173 (2d Cir. 1990) (holding "even if court believes that it would dismiss the complaint in response to a motion under [12(b)(6)], that is not reason to dismiss for lack of jurisdiction").

Dismissal is proper under Rule 12(b)(1) only when the claim "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or . . . is wholly insubstantial and frivolous." Kehr, 926 F.2d at 1408-09 (citing Bell v. Hood, 327 U.S. 678, 682 (1946)).  A claim is insubstantial only if "'its unsoundness so clearly results from the previous decisions of this court as to foreclose the subject and leave no room for the inference that the questions sought to be raised can be the subject of controversy.'" Hagans v. Lavine, 415 U.S. 528, 538 (1973) (citing Ex parte Poresky, 290 U.S. 30, 32 (1933)).  Under a 12(b)(1) motion, unlike a 12(b)(6) motion, the plaintiff

bears the burden of persuasion.  Kehr, 926 F.2d at 1409.  However, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of a jurisdictional claim."  Mortensen v. First Fed'l Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977).  The trial court is free to weigh the evidence to determine if it has subject matter jurisdiction.  Id.

Challenges to subject matter jurisdiction under Rule 12(b)(1) may be "facial" or "factual."  Taliaferro v. Darby Twp. Zoning Bd., 458 F.3d 181, 188 (3d Cir. 2006) (citations omitted).  Facial attacks "contest the sufficiency of the pleadings, and the trial court must accept the complaint's allegations as true."  Turicentro, S.A. v. American Airlines, Inc., 303 F.3d 293, 300 n.4 (3d Cir. 2002) (citing NE Hub Partners, L.P. v. CNG Transmission Corp., 239 F.3d 333, 341 n.7 (3d Cir. 2001)); see also In re Kaiser Group Int'l Inc., 399 F.3d 558, 561 (3d Cir. 2005) (In evaluating "facial" subject matter jurisdiction attacks, the court ordinarily accepts all well-pleaded factual allegations as true, and views all reasonable inferences in the plaintiff's favor).  Essentially, a "facial" challenge by the defendant contests the adequacy of the language used in the pleading.  Turicentro, 303 F.3d at 300 n.4.

Factual challenges, on the other hand, attack the factual basis for subject matter jurisdiction; that is, in a factual challenge to jurisdiction, the defendant argues that the allegations on which jurisdiction depends are not true as a matter of fact.  See Turicentro, 303 F.3d at 300.  As such, the court is not confined to the allegations in the complaint, but may look beyond the pleadings to decide the dispute.  Cestonaro v. United States, 211 F.3d 749, 752 (3d Cir. 2000) (citing Mortensen, 549 F.2d at 891).

19

Thus, presented with a "factual" attack to subject matter jurisdiction, the court must weigh the evidence related to jurisdiction, with discretion to allow affidavits, to determine whether the plaintiff's factual claims are true or untrue. Turicentro, 303 F.3d at 300. If the defendant contests the jurisdictional allegations, then "it is incumbent upon the plaintiff to respond to the defendant's sworn factual assertions" with something more than conclusory responses. Int'l Ass'n of Machinists & Aerospace Workers v. Northwest Airlines, Inc., 673 F.2d 700, 711 (3d Cir. 1981). If the plaintiff fails to "meet and controvert the defendant's factual proofs, then the district court must determine whether it has subject matter jurisdiction based upon the factual context presented by the defendant." Id. at 711-12. However, if the opposing affidavits present a disputed issue of material fact, the court must permit the case to proceed to a plenary trial to resolve the contested jurisdictional issues. Id. at 712.

On the other hand, assuming that there is jurisdiction, a complaint should be dismissed pursuant to Rule 12(b)(6) if the alleged facts, taken as true, fail to state a claim. Fed. R. Civ. P. 12(b)(6); see In re Warfarin Sodium, 214 F.3d 395, 397-98 (3d Cir. 2000). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1964-65 (2007) (internal citations omitted). Thus, a motion to dismiss should be granted unless the plaintiff's factual allegations are "enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true (even if doubtful in fact)." Id. at 1965 (internal citations omitted).

When deciding a motion to dismiss pursuant to Rule 12(b)(6), only the allegations in the complaint, matters of public record, orders, and exhibits attached to the complaint, are taken into consideration. Chester County Intermediate Unit v. Pa. Blue Shield, 896 F.2d 808, 812 (3d Cir. 1990). A district court must accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom. See Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384 (3d Cir. 1994). Moreover, these allegations and inferences must be viewed in the light most favorable to the plaintiff. Id. However, a court need not accept "'unsupported conclusions and unwarranted inferences,'" Baraka v. McGreevey, 481 F.3d 187, 195 (3d Cir. 2007) (citation omitted), and "[l]egal conclusions made in the guise of factual allegations . . . are given no presumption of truthfulness," Wyeth v. Ranbaxy Labs., Ltd., 448 F. Supp. 2d 607, 609 (D.N.J. 2006) (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)); see also Kanter v. Barella, 489 F.3d 170, 177 (3d Cir. 2007) (quoting Evancho v. Fisher, 423 F.3d 347, 351 (3d Cir. 2005)) ("[A] court need not credit either 'bald assertions' or 'legal conclusions' in a complaint when deciding a motion to dismiss.").

It is not necessary for the plaintiff to plead evidence. Bogosian v. Gulf Oil Corp., 561 F.2d 434, 446 (3d Cir. 1977). The question before the court is not whether the plaintiff will ultimately prevail. Watson v. Abington Twp., 478 F.3d 144, 150 (2007). Instead, the court simply asks whether the plaintiff has articulated "enough facts to state a claim to relief that is plausible on its face." Twombly, 127 S. Ct. at 1974.

**Subject Matter Jurisdiction over Defendants United States Air Force and Michael W. Wynne, Secretary of the Air Force**

Plaintiff's Complaint is brought pursuant to the Federal Tort Claims Act

("FTCA"), 28 U.S.C. §§ 2671 <u>et seq.</u>  which "subjects the United States to tort liability for negligence." <u>Reo v. U.S. Postal Service</u>, 98 F.3d 73, 75 (3d Cir. 1996).  The United States is the sole proper defendant in claims brought under the F.T.C. 28 U.S.C. § 2679.  For this reason, the Court lacks subject matter jurisdiction over the claims against Defendants United States Air Force and Michael W. Wynne, Secretary of the United States Air Force and the claims against these defendants are dismissed.[8]

## Subject Matter Jurisdiction over the Remaining Claims

Under the FTCA, federal courts have jurisdiction over claims against the United States for money damages "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, *if a private person*, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(emphasis added).  Thus, the FTCA limits the types of claims that can be brought against the government, absent a specific waiver of sovereign immunity.  <u>Jaffee v. United States</u>, 592 F.2d 712, 718 (3d Cir. 1979); 28 U.S.C. §§ 1346(b)(1), 2674.

Essentially, the FTCA is a procedural remedy by which plaintiffs can apply substantive state tort law against the United States. 28 U.S.C. §§ 2679(a) and (b)(1). The underlying events in this case occurred on Maguire Air Force Base; therefore, New Jersey tort law governs these claims.  To avoid dismissal under 12(b)(1), Plaintiff must show that the government is subject to liability for negligence under New Jersey law.

---

[8] In her opposition brief, Plaintiff concedes that the dismissal of the United States Air Force and Michael W. Wynne, Secretary of the United States Air Force is warranted.

This presents a factual challenge to the Complaint, and, for the reasons stated supra.,

the Court may weigh the evidence related to jurisdiction.  Turicento, S.A., 303 F.3d at

300.

Plaintiff alleges that the United States was negligent because it failed to follow its

own policies and procedures with respect to the investigation of abuse and subsequent

act in permitting Nailah to return to the base.  Such a claim can only succeed if Plaintiff

can identify a corresponding duty under New Jersey law.  See Cecile Industries, Inc. v.

United States, 793 F.2d 97, 99 (3d Cir. 1986)(In order to sustain a claim under the

FTCA, Plaintiff must demonstrate the existence of a parallel duty under New Jersey

State Law.); Blessing v. United States, 447 F.Supp. 1160, 1186 n. 37

(E.D.Pa.1978)("plaintiffs may not base their claims [under the Federal Tort Claims Act]

on alleged breaches of a duty arising solely out of federal law when there is no

corresponding duty under state tort law".).  But governmental liability can be found

even where a private citizen does not perform the complained of governmental function.

Indian Towing Co. v. United States, 350 U.S. 61, 64 (1955)(liability for Coast Guard

charged with ensuring that the lights in a lighthouse were functioning, even though

there is no analogous private duty because "it is hornbook tort law that one who

undertakes to warn the public of danger and thereby induces reliance must perform his

'good Samaritan' task in a careful manner.")  The government contends that New Jersey

law does not permit recovery in this case because there is no parallel private duty of care

that can be imposed upon the government under the facts of this case.[9]  The Court

_____

[9]The parties do not cite any cases that address the specific issue before this Court:
whether an agency of the United States charged with investigating instances of child

23

agrees.

First, Plaintiff's allegations that the government's failure to act in accordance

with its policies and procedures is not in itself a reflection of an independent duty.[10]  See

Pottle v. United States, 918 F.Supp. 843, 849 (D.N.J. 1996)(A government "directive is

not a reflection of an independent duty of care, but only a command as to how

government employees should properly carry out their assigned duties. Nearly every

government employee is guided by officially-issued directives, and to construe each as

an expression of an independent duty of care would be to expose the government to

liability beyond the scope assumed in the Federal Tort Claims Act."); Daley v. United

_____

abuse and/or neglect owes a duty of care under any state's law.

[10]Plaintiff's reliance on Doggett v. United States, 875 F.2d 684, 694 (9th Cir. 1989) is unavailing as that case was reversed by the United States Supreme Court.  United States v. Olson, 546 U.S 43, 45 (2005)("And we reverse a line of Ninth Circuit precedent permitting courts in certain circumstances to base a waiver simply upon a finding that local law would make a 'state or municipal entit[y]' liable.").  To the extent Plaintiff seeks to argue that only a portion of Doggett was abrogated, it is distinguishable from the underlying case.

In, Doggett, the court imposed a Good Samaritan duty of care upon the United States Navy in performing duties contained in a Navy regulation which required detention and care for intoxicated personnel.  875 F.2d 684.  Even if Doggett was still good law, the Navy failed to perform its duty under that regulation; it failed  to prevent the sailor from leaving base.  Here, the FAP acted, intervened, and the child was sent to live with her mother.  The FAP did not order April off base, seek criminal charges against April, or order that the child be removed from the home.  In addition, DYFS did not open a file, presumably because the circumstances of the "time-out" incident did not warrant their involvement.  Thus, failing to notify Zakiyyah and the failure of the FAP to know that Nailah returned to base did not create circumstances where the murder of Nailah was foreseeable.  Plaintiff has not identified a regulation requiring Nailah's exclusion from base.  And the failure to inform Zakiyyah has no bearing on the fact that FAP intervened and the Williamses' received help with their discipline techniques.  Thus, in terms of likelihood of harm and Good Samaritan obligations, failing to inform Zakiyyah is not analogous to letting a drunken sailor wander off base.  Doggett, 875 F.2d at 624.

States, 499 F.Supp. 1005, 1010 (D.C.Mass. 1980)("procedures outlined in an internal government manual do not define a standard of care owing to the public."); see also Art Metal-U.S.A., Inc. v. United States, 753 F.2d 1151, 1157 (D.C. Cir. 1985)(stating that the negligent performance by a government agency of duties embodies in federal statutes may give rise to a claim under the FTCA if analogous duties under state tort law exist). In this regard, Plaintiff's reliance on the undertaking of the FAP was related to the FAP imparting better disciplinary techniques to April and Donnyell.  There is no allegation that the FAP did not fulfill this obligation, distinguishing this case from Indian Towing Co., 350 U.S. at 64.

Second, Plaintiff has failed to identify a cognizable duty of care that exists in New Jersey state law that could be extended to the government in this case.  A Plaintiff must prove negligence by a preponderance of the evidence and establish: 1) that the defendant owed her a duty under the circumstances that gave rise to the action; 2) that the defendant breached that duty; and 3) that the defendant's breach was a proximate cause of the harm.  Keith v. Truck Stops Corp. Of America, 909 F.2d 743, 745 (3d Cir. 1990).

The foundational element in determining the existence of a duty of care is whether the risk of harm was foreseeable.  Williamson v. Waldman, 150 N.J. 232, 239 (1997).  Such knowledge may be actual or constructive.  Carvalho v. Toll Brothers, 143 N.J. 565, 576-77 (1996).  A defendant may be charged with constructive knowledge where he is "in a position" to "discover the risk of harm." Id. at 578.  As here, where "the risk of harm is that posed by third persons, a plaintiff may be required to prove that the defendant was in a position to 'know or have reason to know, from past experience, that there [was] a likelihood of conduct on the part of [a] third person[ ]' that was 'likely to

endanger the safety' of another." J.S. and M.S. v. R.T.H., 155 N.J. 330, 338

(1998)(quoting Clohesy v. Food Circus Supermarkets, Inc., 149 N.J. 496, 507

(1997(internal quotation and citation omitted)).

Foreseeability, however, is only one component in the determination of whether a

duty of care exists.  Other considerations include fairness and public policy.  Clohesy,

supra., 149 N.J. at 502.  Ultimately, a determination of the existence of a duty requires

an evaluation of all of these factors, in addition to consideration and balancing of the

competing interests of the parties.  Id.; Portee v. Jaffee, 84 N.J. 88, 101 (1980).

Here, the FAP, and corresponding agencies, undertook an investigation of the

November 5, 2003 incident involving April Williams and Nailah.  The fact that the FAP

asked to be informed of the child's return to base indicates and was not so informed

raises serious questions as to the foreseeability of this tragic event.  Donnyell and April

Williams agreed that they would inform the FAP if Nailah returned and they did not.

(Family Advocacy Record, Plaintiff's Ex. G.).  Under these circumstances, the tragic

death of Nailah cannot have been foreseeable to the FAP.[11]

---

[11]Plaintiff's argument that the Air Force should have placed Nailah on a *persona non grata* list and refused her entry onto the base without the express permission of the FAP is unpersuasive.  Nailah left base following the investigation of the "time-out" incident, which was classified as mild.  (Family Advocacy Record, Plaintiff's Ex. G.).The findings of the investigation did not warrant measures being put in place to alert FAP officials if the child returned to base; there was no finding that Nailah's presence in the Williamses' home placed the child in imminent danger warranting such an alert system. Also, there was no reason to remove April Williams from base or Nailah from their home.  Standing alone, this was bad judgment and inexperience on the part of April Williams, not an *ipso facto* indicator of abuse, physical or otherwise.

In addition, in the Family Advocacy Record closing the matter, the report indicates that in addition to the child being with her mother, another reason favoring closing the file was the fact that the family was "well adjusted."  (January 7, 2004 Family Advocacy Record, Plaintiff's Ex. G.)  These are not compelling reasons for requiring the

During oral argument, Plaintiff stated that if she had known about the "time-out" incident she never would have permitted Nailah to return to the care of Donnyell and April.  This fact is unrelated to the foreseeability of Nailah's death from the FAP's perspective.  Importantly, the FAP did not ban Nailah from base; her return to base was not problematic as even if she returned, they did not foresee that her return would result in physical harm.  Plaintiff's argument overlooks this fact— Nailah was never removed from the home; her presence there was not of concern.  Thus, even assuming that the FAP knew Nailah returned and that, as a result, it again monitored the family, the murder still could have occurred.  Plaintiff would like this Court to assume that FAP's re-engagement of the Williamses would have been tantamount to an FAP investigator stationed in the home, preventing the tragic events of May 15, 2004.  In this regard, Plaintiff's assessment of the obligations of FAP is at once too broad and too narrow.  The harm was not foreseeable to the FAP.

The duty analysis also includes an "assessment of the defendant's 'responsibility for the conditions creating the risk of harm' and an analysis of whether the defendant

_____

security guards at the entry points on the Maguire Air Force Base to ensure that Nailah does not return without permission; FAP had the assurances of the Williamses that they would inform them if the child returned. It would be unfair under these circumstances to place a duty upon FAP.

In this regard, Plaintiff's reliance on C.W. v. Cooper Health Systems, 906 A.2d 440 (N.J.Super. Ct. 2006) is unpersuasive.  In that case the court found that the hospital owed the patient's partner a duty of care to notify her that her partner had the HIV virus.  In C.W. it was foreseeable that the partner and patient would engage in sexual relations increasing the risk that she, too, would be infected with the virus.  Here, even if it was foreseeable that the child would return to base, FAP had the assurances that the Williamses would notify them.  In addition, even if she did return, the fact that April Williams would murder her, or even physically harm, her was not foreseeable to the FAP.

had sufficient control and ability to have avoided the risk of harm." <u>J.S.,</u>155 N.J. at 339

(citing <u>Kuzmicz v. Ivy Hill Park Apts., Inc.,</u> 147 N.J. 510, 515 (1997)).  The worst that can

be said for the government's role is that it failed to inform Plaintiff of the incident, which

may have been a factor in Plaintiff's decision to return the child to her father.  However,

the government investigated the claim, found no evidence of physical abuse and little

cause for intervention.  Even New Jersey's Division of Youth and Family Services

declined to investigate the matter. (Family Advocacy Record, Plaintiff's Ex. G.). April

Williams was college-educated and had no prior record of abuse or criminal activity.

The FAP provided parenting guidance and counseling for the Williamses.  It cannot be

said that the FAP's involvement made things worse or created an opportunity for this

incident to happen. <u>Compare</u>, <u>Indian Towing Co.</u>, 350 U.S. 61.

　　　　Third, Plaintiff's attempt to support the existence of a duty of care under the

"Good Samaritan" laws, codified in § 324A of the Restatement (Second) of Torts (1965)

is unavailing.  That section provides:

> One who undertakes, gratuitously or for consideration, to render services
> to another which he should recognize as necessary for the protection of a
> third person or his things, is subject to liability for physical harm resulting
> from his failure to exercise reasonable care to [perform] his undertaking, if
> (a) his failure to exercise reasonable care increases the risk of such harm,
> or
> (b) he has undertaken to perform a duty owed by the other to the third
> person, or
> (c) the harm is suffered because of reliance of the other or the third person
> upon the undertaking.

Restatement (Second) of Torts § 324A (1965).

　　　　Generally, the Good Samaritan laws are meant to shield persons who render help

from liability for wrongdoing born out of their attempted assistance. <u>See</u> <u>Praet v.</u>

<u>Borough of Sayreville</u>, 218 N.J.Super. 218, 225, 527 (App.Div.1987) (stating that the

unifying purpose of Good Samaritan Act, N.J.S.A. 2A:62A-1, was "to induce voluntary rescue by removing the fear of potential liability ... as an impediment to such [action]") These laws encourage our citizens to provide assistance to those in need.  A classic example is a doctor driving by the scene of a car accident.  Without the shield of the Good Samaritan law, the doctor may drive by the accident scene, instead of stopping to provide help.  See Velazquez ex rel. Velazquez v. Jiminez, 172 N.J. 240, 251 (2002)("In sum, Good Samaritan legislation has, at its core, the goal of encouraging the rendering of medical care to those who need it but otherwise might not receive it (ordinarily roadside accident victims), by persons who come upon such victims by chance, without the accoutrements provided in a medical facility, including expertise, assistance, sanitation or equipment.")

Plaintiff's attempt to use the Good Samaritan law to ascribe a duty to the government in this case misses the mark.  Once Nailah left the base and moved to Zakiyyah's house, the government's intervention ceased.  In fact, Plaintiff admits that when Nailah returned to base, the FAP was unaware of her presence on base.[12]  Since FAP was unaware of Nailah's return, there can be no Good Samaritan violation, assuming a duty existed under this provision at all.[13]  In this regard, Plaintiff's attempt

[12]Plaintiff maintains that the Air force should have placed Nailah on a *persona no grata* list and prevented her from re entering the base with out the permission of the FAP.

[13] Plaintiff's reliance on K.J. ex rel. Lowry v. Division of Youth and Family Services, 363 F.Supp.2d 728 (D.N.J. 2005) is inapplicable to this case.  First, that case involved New Jersey's Child Placement Bill of Rights Act which does not apply to the United States Air Force.  Second, that case dealt with the placement of children outside of their home, with foster parents.  Finally, the government in this case is not under the same obligations as DYFS in K.J. with respect to child protection. For all of these

to liken this case to the decision in <u>Doggett</u>, 875 F.2d at 694 is unavailing. <u>See</u>, n. 10, <u>supra.</u>

Finally, Plaintiff's claim that the government was a proximate cause of Nailah's death must fail.  "The proximate cause inquiry asks 'whether the [injury] was reasonably foreseeable or was, on the contrary, a remote or abnormal incident . . . that was not otherwise reasonably foreseeable by defendant []." <u>Jakelsky v. Friehling</u>, 33 F.Supp. 2d 359, 365 (D.N.J. 1999)(quoting <u>Cowan v. Doering</u>, 111 N.J. 451, 465 (1988).  Even giving all reasonable inferences to Plaintiff and taking the allegations in the Complaint as true, the criminal actions of April Williams were not reasonably foreseeable by the government.  The Complaint fails to set forth a claim that April Williams's criminal actions were foreseeable.[14]

For all of these reasons, Plaintiff has failed to identify an actionable duty and the Complaint is dismissed pursuant to Fed.R.Civ.P. 12(b)(1) for want of jurisdiction.

## <u>CONCLUSION</u>

For all of the reasons stated herein, Defendant Donnyell Williams's motion for summary judgment is DENIED and Defendants', United States of America, the United States Air Force, and Michael W. Wynne, Secretary of the United States Air Force,

---

reasons, <u>K.J.</u> is unavailing to the instant action.

[14]Even if Plaintiff were successful in obtaining federal jurisdiction as to this allegation, it would still be dismissed under Fed.R.Civ.P. 12(b)(6) for failing to state a claim upon which relief can be granted.  Based upon a review of the Complaint, the government cannot be said to have been a proximate cause of the tragedy in this case because it was not "reasonably foreseeable by defendant []." <u>Jakelsky</u> 33 F.Supp. 2d at 365 (quoting <u>Cowan v. Doering</u>, 111 N.J. at 465).

motion to dismiss is granted.  An appropriate Order shall enter today.

Dated: June 30, 2008

 /s/ Joseph H. Rodriguez
Joseph H. Rodriguez,
UNITED STATES DISTRICT JUDGE
